IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IVAN KOSTIC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:18-cv-00556 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| UNITED PARCEL SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 43, "Motion"), accompanied by a Memorandum of Law in support thereof (Doc. No. 45). Plaintiff filed a Response (Doc. No. 50), Defendant filed a Reply (Doc. No. 53), Plaintiff filed a Sur-Reply (Doc. No. 58), and Defendant filed a Response to Plaintiff's Sur-Reply (Doc. No. 59). Plaintiff also filed a Response to Defendant's Statement of Undisputed Facts (which included Plaintiff's Statement of Additional Material Facts) (Doc. No. 49), and Defendant responded to that statement of additional material facts (Doc. No. 54). For the reasons set forth herein, the Motion will be granted in part and denied in part.

## BACKGROUND

Plaintiff Kostic was born in Leskovac, Serbia[1] in 1972 and moved to Canada when he was three years old. He resided in Canada until 2002, when he moved to Middle Tennessee. (Doc. No.

---

[1] In 1972, Leskovac, like all of what is today Serbia, was part of the now-defunct Socialist Federal Republic of Yugoslavia, which comprised the area covered by the now-existing independent nations of Slovenia, Croatia, Montenegro, Bosnia & Herzegovina, North Macedonia (which, in a matter of true diplomatic importance and controversy, until recently was formally known either as

54 at ¶¶ 1, 4). Plaintiff became a U.S. citizen on October 24, 2013. (Doc. No. 48-1 at 4-5 [Dep. at 9-10]). From January 2005 until June 2008, Plaintiff worked as a permanent part-time employee of Defendant UPS as a delivery truck loader. (Doc. No. 54 at ¶ 6). On June 12, 2008, Plaintiff became a full-time employee of Defendant as a "package car driver." (*Id.* at ¶ 7). Plaintiff identifies his race as Eastern European (Doc. No. 49 at ¶ 3) and his national origin as Serbia(n). (*Id.* at ¶ 4).

On July 17, 2017, Defendant discharged Plaintiff for "failing to treat his supervisors with dignity and respect." (Doc. No. 49 at ¶ 41). Plaintiff alleges that Defendant discriminated against him because of his race and national origin and subjected him to a hostile work environment. Plaintiff further maintains that he was fired because of his race and national origin and in retaliation for his protected activity of filing grievances and calling the Human Resources hotline about the alleged racial and national origin discrimination and harassment against him.

---

the Republic of Macedonia or the Former Yugoslav Republic of Macedonia), and Serbia; it also includes the area comprising Kosovo, which historically has been part of Serbia but is now recognized as an independent state by approximately 100 nations (including the United States but not Serbia). The undersigned notes, as is a matter of public record, that approximately a decade ago he served overseas with the United States government for 19 months in Serbia (with official business taking him elsewhere in Eastern Europe as well). The undersigned can state unequivocally that such experience has left him with a firm understanding of issues surrounding the nationality and (alleged) race upon which Plaintiff claims he was discriminated against, but the experience has not left him predisposed to be biased either in favor of or against either party in this matter. Likewise, the undersigned does not rely herein on any impressions he has regarding matters Serbian or Eastern European beyond those he believes subject to judicial notice anyway—including whether, as Defendant suggests, alleged comments of which Plaintiff complains are objectively unrelated to Serbia, Eastern Europe, or both and thus objectively do not implicate Plaintiff's claimed national origin or race. To the extent the undersigned conveys any other impressions, he does not rely on them but rather notes them merely to help underscore his understanding of applicable issues and, relatedly, the reality that if Plaintiff's theories of racial discrimination and national origin discrimination make no sense to him, it is not because he is ignorant regarding Eastern Europe or Serbia but rather because the theories are objectively non-sensical.

Plaintiff's Complaint (Doc. No. 1) asserts the following claims: COUNT I - discrimination in violation of Title VII based upon race and national origin; COUNT II – hostile work environment in violation of Title VII based upon race and national origin; COUNT III – retaliation for protected activity in violation of Title VII; COUNT IV – racial discrimination in violation of 42 U.S.C. § 1981; and COUNT V – discrimination in violation of the Tennessee Human Rights Act ("THRA") based upon race and national origin.[2]

### SUMMARY JUDGMENT

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A

---

[2] The Complaint also alleges "Counts" for punitive damages and attorneys' fees and expenses of litigation, but such Counts set forth *requested remedies*, not *claims*. The first paragraph of the Complaint also alleges that Defendant is liable to Plaintiff under Tennessee common law, but the facts asserted in the Complaint do not specifically address liability under common law; moreover, liability under Tennessee common law is not asserted in any of the Counts, and the Complaint does not identify what Tennessee common law was allegedly violated.

3

genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id*. at 628.

A party asserting that a fact cannot be or genuinely is disputed—i.e., a party seeking summary judgment and a party opposing summary judgment, respectively—must support the assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

4

To obtain summary judgment on Title VII or THRA claims[3], a defendant either (i) must show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case and it is entitled to judgment as a matter of law on that element; or, if it fails to do that, (ii) make an evidentiary showing[4] that there was a legitimate, nondiscriminatory reason for its alleged actions and then show that there is no genuine issue of material fact as to pretext and that it is entitled to judgment as a matter of law on that issue. The plaintiff, on the other hand, to avoid summary judgment, (i) must present sufficient evidence to demonstrate a genuine issue of material fact as to any elements of his *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and also (ii) show that the defendant (a) cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or (b) demonstrate that there is a genuine issue of material fact as to pretext.[5]

## DISCRIMINATION

Title VII and the THRA prohibit discrimination based on, *inter alia*, national origin. 42 U.S.C. § 2000e-2; Tenn. Code Ann. § 4-21-102(4). By contrast, Section 1981 prohibits discrimination on the basis of race but not discrimination on the basis of national origin. *See Saint Francis College v. Al–Khazraji,* 481 U.S. 604, 613 (1987); *Amini v. Oberlin Coll.*, 259 F.3d 493,

---

[3] This same burden of proof applies for Section 1981 claims. *Wyatt v. Nissan N. Am., Inc.*, No. 3:17-cv-1545, 2019 WL 6682197, at *3 (M.D. Tenn. Dec. 6, 2019).

[4] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

[5] As indicated below, courts' reference to a plaintiff's requirement to show "pretext" is actually a requirement to show not just pretext (*i.e.,* that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

502 (6th Cir. 2001) ("The Supreme Court has held in *Saint Francis College* that only claims of racial, as opposed to national origin, discrimination are cognizable under § 1981.").[6]

Plaintiff alleges disparate treatment because of his race and national origin in violation of Title VII, the THRA, and Section 1981. As noted above, Plaintiff contends that his race is "Eastern European" and his national origin is Serbia(n). The Court will address Plaintiff's race claim first.

A. Race

Plaintiff asserts that he is of the "Eastern European" race. (Doc. No. 53 at 2-3). However, Plaintiff does not define, identify, or explain what the "Eastern European" race is and what its features are that make it a distinct race, although he does claim that it is different from the Caucasian race. (Doc. No. 49 at 4). For reasons unknown, Defendant does not challenge the characterization of "Eastern European" as a race for purposes of Section 1981. But whether a purported race is actually a race for purposes of Section 1981 is an issue of law for the court. *Vill. of Freeport v. Barrella*, 814 F.3d 594, 616 (2d Cir. 2016) ("As a matter of law, 'Hispanic' is a race for purposes of § 1981"). Therefore, a court can resolve such issue even if (for whatever reason) the defendant did not raise it, and the Court will do so here. And the undersigned simply cannot accept the claim that "Eastern European" is a cognizable race for purposes of the anti-discrimination statutes.[7]

---

[6] It is not lost on the Court that the concept of someone's "race" for purposes of Section 1981 (or Title VII) overlaps to a degree with the concept of "national origin" for purpose of Title VII. *See Daemi v. Church's Fried Chicken, Inc.*, 931 F.2d 1379, 1387 n.7 (10th Cir. 1991) ("We are cognizant, however, that often the line between national origin discrimination claims under Title VII and racial discrimination claims under § 1981 is 'not a bright one.'") (quoting *Saint Francis College*, 481 U.S. at 614 (Brennan, J., concurring)).

[7] The undersigned would not be the first federal judge to decline to accept unequivocally at face value the claim that "Eastern European" is a cognizable race for purpose of the kinds of anti-

"Title VII does not define the term 'race.' And, in the more than 50 years since Title VII was enacted, the EEOC [Equal Employment Opportunity Commission] has not seen fit to issue a regulation defining the term." *EEOC v. Catastrophe Mgmt. Sols.*, 852 F.3d 1018, 1026 (11th Cir. 2016). So the question naturally arises as to what is meant by "race" for purposes of Title VII. The Court could pontificate at some length about the various different judicial takes on this issue, *see, e.g.*, *id.* at 1026-30, and then announce its take. Fortunately, it need not do so here to dispose of Plaintiff's claim that "Eastern European" is a race. Whatever it means to be a "race," it is axiomatic that the members of a "race" have personal attributes in common; that is what makes them members of a common race.[8] Courts and commentators may disagree about what particular common personal attributes define a particular race and make persons with those attributes a member of such race, but there can be no question that it is these commonalities that enable persons sharing them to be classified as members of the same particular race.

The problem for Plaintiff is that he has not shown any personal attributes that members of the "Eastern European" race would all have in common beyond the sheer geographic location of themselves (or their ancestors). And in the Court's view this is not nearly enough; indeed, as

discrimination statutes at issue here. In *Zavalidroga v. Oneida Cty. Sheriff's Dept.*, No. 6-11-CV-277, 2012 WL 1068844 (N.D.N.Y. Mar. 29, 2012), the court stated that "[w]hile it is questionable whether Eastern Europeans constitute a distinct racial group, the Court need not resolve the issue on this motion." *Id.* at *8 (citation omitted). Thus, the court accepted only *arguendo* "for the purpose of [a motion to dismiss] that Eastern European heritage constitutes a 'race' under section 1981." *Id.* at *13.

[8] Courts and commentators may disagree about what *kinds* of common personal characteristics should be considered in identifying a race. Is it only physical (including genetic) characteristics, or is it also cultural characteristics? As for physical characteristics, is it only immutable physical characteristics, or is it also mutable characteristics? But again, there is no question it is common personal characteristics of certain kinds that place individuals into a particular "race."

7

discussed below, the specification of this geographic location merely serves to highlight the lack of commonality of personal attributes of persons associated with this geographic location.

One might be tempted to say that Eastern Europeans at least have in common the fact that they are "white" and then ask whether this is sufficient for "Eastern Europeans" to be a "race" to which Plaintiff belongs. But there are multiple problems with this. To begin with, Plaintiff does not indicate whether, by "Eastern Europeans," he is referring to (a) whatever denizens (of whatever variety) happen to live now in "Eastern Europe" (whatever "Eastern Europe" means); or (b) persons descended from the traditional or indigenous inhabitants of "Eastern Europe." If he has (a) in mind, then of course "Eastern Europeans" thus defined would not all have in common the characteristic of being white; not all of today's denizens of "Eastern Europe" (and indeed of any large geographical region) are "white." If Plaintiff has (b) in mind, which seems more likely given the connotations of the word "race," perhaps all such "Eastern Europeans" would be "white," but Plaintiff himself can hardly complain about being discriminated against based on being an "Eastern European" in that sense, because he explicitly denies considering himself "white" (or "Caucasian"); in opposing the Motion, Plaintiff quotes his own deposition for the proposition that he "'does not identify as Caucasian', and does not consider himself 'white'." (Doc. No. 49 at 4) (citations omitted).[9] So Plaintiff is asserting that he is "Eastern European" despite not being

_____

[9] Plaintiff appears to attempt to directly contrast being "white" with being Serbian. (Doc. No. 49 at 4) (directly juxtaposing the notion of being "white" or "Caucasian" on the one hand with being of "Serbian heritage" and "speaking Serbian" on the other hand). The Court is at a loss here. It is clear in context that when Plaintiff refers to "Serbian" here, he is talking about traditional, ethnic Serbian—and not, for example, "Serbian" in the sense of being a citizen or resident of the Republic of Serbian as members of many ethnic groups (such as Roma) are without being traditionally, ethnically Serbian. But there is simply no contrast between being traditionally and ethnically Serbian and being "white" or Caucasian. Ethnic Serbs are a Slavic people, which are indeed a

8

"white," which leaves the Court guessing at what kind of persons, with what common characteristics, Plaintiff has in mind when he refers to "Eastern Europeans." The Court simply cannot tell and indeed cannot fathom what he possibly has in mind here.

Whatever Plaintiff's theory of a cognizable "Eastern European" race, it was doomed to failure. The notion of "Eastern Europe" is an ambiguous and amorphous one. Take Plaintiff's stated country of national origin, for example. Certainly Serbia is often said to be in "Eastern Europe." But there is no consensus—and certainly no authoritative or official view—on whether Serbia is properly considered to be in "Eastern Europe," "Southeastern Europe," or "Central

---

"white" and "Caucasian" people any way one (one knowledgeable, that is, about ethnic Serbs and the narrowest use of the terms "white" or "Caucasian") looks at it.

The Court notes that he believes that the observations (and the facts implied) in the prior paragraph, in addition to being in his view entirely undisputable based on his 19 months living in Serbia, are subject to judicial notice.

The Court can only speculate as to why Plaintiff would seek to assert a non-sensical distinction between being of "Serbian heritage" and being white (or Caucasian). Perhaps Plaintiff's incentive derives from case law suggesting the importance to a Section 1981 claim of the plaintiff belonging to a non-"white" race. For example, courts have treated "Hispanic" as a race for purposes of Section 1981 because Hispanic people are often perceived as non-white. *See, e.g., Mojica v. Advance Auto Parts, Inc.*, Civ. No. 15-1418, 2016 WL 107844, at *4 (E.D. Pa. Jan. 11, 2016). And other times plaintiffs have been unsuccessful precisely because they have not alleged (or supported with evidence, as the case may be) that they are perceived as non-white. For example, in *Dominici v. Reading Hosp./Tower Health*, No. 5:18-cv-04181, 2020 WL 2898658 (E.D. Pa. June 3, 2020), the plaintiff claimed she was discriminated against on the basis of being European and/or Italian, but she did not allege that she was perceived as a non-white. The court found that Section 1981 offered her no relief because she did not belong to a racial minority. *Id.* at *15; s*ee also Petrone v. Reading*, 541 F. Supp. 735, 738-39 (E.D. Pa. 1982) (dismissing plaintiff's § 1981 claim, which was predicated upon his Italian heritage, because "there is no allegation that plaintiff is generally perceived as a non-white").

The upshot is that Plaintiff has an incentive to be non-white for purposes of Section 1981 claim in particular. And he has an incentive to be (as is undisputed anyway) of Serbian heritage for purposes of his national-origin discrimination claims. Plaintiff (or, perhaps, maybe only his counsel) seems not to understand that these two incentives conflict in that to be Serbian in the traditional sense is to be "white" and "Caucasian," even if there is some variation in the pigmentation of skin across ethnic Serbs as a whole.

9

Europe." Speaking more generally, although there arguably is something resembling a consensus as to the contours of the eastern boundary of Europe (a boundary with Asia, of course)—which would presumably include the eastern boundary of Eastern Europe—there is nothing close to a generally recognized southern or western boundary of Eastern Europe. This is all to say that when a race is defined in terms of "Eastern Europe," it is defined in terms of something undefined and, at this point, undefinable. This by itself does not mean that "Eastern European" is not a race; the Court understands that, even for "races" that are widely recognized as races, there can be disagreement at the metaphorical margins as to who is properly included in the race and what is properly associated with the race. But uncertainty as to what is "Eastern Europe" certainly casts doubt on any assertion that "Eastern European" is a definable race, especially since Plaintiff himself ties his national origin back to a place that is by no means universally considered "Eastern European."

In perhaps its broadest conception, "Eastern Europe" spans from Greece in the Southwest to the northernmost part of Russia just west of the Ural Mountains. Without question, this area not only is geographically vast, but also encompasses a very diverse array of cultures, religions, languages and groups of peoples (traditionally and as of today) of different general physical and genetic characteristics. The area includes not only Greeks and Russians (as suggested above), but Romanians and Poles also, for instance. Merely to cite these exemplary countries is to reveal the diversity of personal characteristics involved.

Presumably, if a narrower conception of "Eastern Europe" is adopted, the diversity would be correspondingly reduced. But Plaintiff still would have a problem under such narrower conception because many narrower conceptions of "Eastern Europe" indisputably exclude Serbia, thus leaving the Court to wonder what he means by "Eastern Europe." And even the tightest "core"

10

group of Eastern European countries surely would include, for example, Poland, the Czech Republic, and Hungary. Considerable diversity exists between inhabitants of these countries as well.

All of these observations really are to the same effect. No matter how broadly one might construe the notion of race, the notion of Eastern Europe is too vague, and the commonalities that would define an "Eastern European" race are too illusory, for the Court to countenance "Eastern European" as a race. And, as discussed above, what would appear to be perhaps the best candidate for a genetic commonality—being white or Caucasian—cannot support Plaintiff's theory of an Eastern European race that includes him, because his position is that he lacks this genetic trait. For these reasons, the Court finds as a matter of law that "Eastern European" is not a "race" for purposes of Title VII or Section 1981.

To the extent the Court is relying *sua sponte* on its own rationale here (as Defendant does not specifically contest the notion that "Eastern European" is a race), the Court perceives that it has the authority to do so, as noted above, inasmuch as the question of whether a claimed race is in fact a race for purposes of anti-discrimination statutes is one of law for the court. *Vill. of Freeport,* 814 F.3d at 607 ("We disagree with the District Court's ultimate decision to treat the existence *vel non* of a Hispanic 'race' as a question of fact. The meaning of the word 'race' in Title VII is, like any other question of statutory interpretation, a question of law for the court."), *quoted in Catastrophe Mgmt. Sols.*, 852 F.3d at 1026. And so, as noted, the Court decides *sua sponte* as a matter of law that "Eastern European" is not a race.[10]

_____

[10] To the extent that the Court relies herein on facts to support its legal conclusion, the facts are rather general in nature and are, in the Court's view, subject to judicial notice as being accurately and readily determined from sources whose reliability cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2).

And even if the question of whether "Eastern European" is a race were properly considered a question of fact, the Court believes that it could enter summary judgment based on *sua sponte* resolving this question against Plaintiff. The Court has the authority to enter summary judgment *sua sponte* so long as the losing party was on notice of the need to come forward with all of its (material) evidence. *See Employers Ins. of Wausau v. Petroleum Specialties, Inc.,* 69 F.3d 98, 105 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)); *see also* Fed. R. Civ. P. 56(f). Here, Plaintiff was on notice that Defendant has asserted that Plaintiff self-identified as "white" (rather than "Eastern European") and was in the same "protected class" as his Caucasian supervisors. (Doc. No. 45 at 2, 6). Here, Plaintiff was on notice of the need to come forward with evidence to show that he belonged to the "Eastern European" (rather than "white" or "Caucasian") race, which necessarily entails coming forward with evidence to establish that such a race exists. Plaintiff  has failed to do so.

For these reasons, Plaintiff cannot show that he was treated differently based on race for purposes of Title VII, the THRA, or Section 1981. Because a claim under Section 1981 is based entirely on the plaintiff's race, Plaintiff's Section 1981 claim will be dismissed. To the extent Plaintiff's Title VII and THRA claims are based upon racial discrimination, those claims will also be dismissed.

2. National Origin

Plaintiff also asserts claims under Title VII and the THRA grounded on alleged disparate treatment based on his national origin (Serbian). Plaintiff's claims for national origin discrimination will be analyzed in the same manner under Title VII and the THRA. *Debra Jodry v. Fire Door Solutions, LLC*, No. 3:20-cv-00243, 2020 WL 7769924, at *3 (M.D. Tenn. Dec. 30, 2020).  A plaintiff may establish employment discrimination (including that based on national

origin) through direct or indirect evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 n.5 (6th Cir. 2008).

A.   *Standards: Direct evidence case*

Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. *McGee v. Food Warming Equip., Inc.*, No. 3-14-cv-01776, 2017 WL 587856, at *2 (M.D. Tenn. Feb. 14, 2017). Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor. *EEOC v. Publix Super Markets, Inc.*, 481 F. Supp. 3d 684, 697 (M.D. Tenn. 2020). Direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group. *Id.* at 697-98. Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of national origin, but also that the employer acted on that predisposition. *Id.* at 698; *see also Lovell v. Champion Car Wash, LLC*, 969 F. Supp. 2d 945, 951 (M.D. Tenn. 2013) (direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group).

As an exceptionally clear example, hypothetical direct evidence would include testimony that the defendant's authorized employee told the plaintiff when terminating him [or her], "You're fired because we want to get rid of employees from [a particular foreign country] because we don't

13

like people from [that country]."[11] Discriminatory remarks by a person who played a meaningful role in the challenged decision, or who had the ability to influence personnel decisions,[12] are relevant direct evidence of discrimination. *Petzel v. Redflex Traffic Sys., Inc.*, No. 2:12-cv-1066, 2015 WL 3409256, at *4 (S.D. Ohio May 27, 2015). And a corporate decision maker's express statement of a desire to remove employees in the protected group also is direct evidence of discriminatory intent. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

If a plaintiff produces direct evidence of discrimination, the burden shifts to the defendant to prove that it would have taken the same adverse action against the employee, "even if it had not been motivated by impermissible discrimination." *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at *5 (M.D. Tenn. May 19, 2016).

### B.  Standards: Indirect evidence case

Indirect (or "circumstantial") evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred. *White*, 533 F.3d at 392 n.5. With circumstantial evidence, the Court

---

[11] By way of example, in actual cases, courts have found that (1) a supervisor's alleged statement that she chose a particular candidate in order "to maintain racial balance" constituted direct evidence of discriminatory intent; and (2) a supervisor's alleged statement that an Italian–American probationary employee was a "dirty wop" and that there were too many "dirty wops" working at the facility, constituted direct evidence of national origin discrimination. *Giles v. Wilson Cty. Bd. of Educ.*, No. 1:17-cv-896, 2018 WL 4680335, at *5 n.4 (M.D. Tenn. Sept. 28, 2018) (citations omitted); *Brewer v. New Era, Inc.*, 564 F. App'x 834, 839 (6th Cir. 2014) (statements made two months before termination decision that plaintiffs were "too old" and "needed to retire" were direct evidence of age discrimination).

[12] Comments made by individuals who are *not* involved in the decision-making process regarding the adverse employment action do not—cannot, under applicable case law—constitute direct evidence of discrimination. *McKibbens v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:17-cv-01110, 2018 WL 6696990, at *3 n.5 (M.D. Tenn. Dec. 20, 2018).

14

applies the three-part burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to determine whether the plaintiff has proffered sufficient evidence to survive summary judgment. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. *Id.*

Under this framework, a plaintiff bears the initial burden to establish a *prima facie* case of employment discrimination by demonstrating that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside the protected class or was treated differently than similarly situated, non-protected employees. *Bruce v. Meharry Med. College*, No. 3:15-cv-00320, 2016 WL 5920231, at *2 (M.D. Tenn. Oct. 11, 2016).

If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006). The Supreme Court has prudently cautioned, given the confusion sometimes discernible in this context, "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens." *Burdine*, 450 U.S. at 253. As the Sixth Circuit recently explained:

> Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

15

Thus, as to the existence of legitimate and non-discriminatory reasons for its actions, the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[13] To meet that burden of mere production, "the defendant need not persuade the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] "must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258).[14]

---

[13] As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times, throughout this burden shifting. *Burdine*, 450 U.S. at 253; *Anthony*, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motion it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on this Motion. Notably, in seeking to meet its burden, the plaintiff cannot rely purely on mere personal belief, conjecture and speculation, because they are insufficient to support an inference of discrimination. *Garren*, 482 F. Supp. 3d at 717.

[14] The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* some non-discriminatory reason that *supposedly* motivated the employment decision, and (b) to provide some evidence that there was a non-discriminatory reason. Both *Burdine* and *Harris* (which, as noted was relying on *Burdine)* make clear that the employer meets its burden of production only if it presents not merely some statement of what the reason supposedly was, but rather evidence of what the reason actually was.

16

If the defendant succeeds in doing so, it rebuts the presumption of discrimination raised by the plaintiff's establishment of a *prima facie* case. *See id.* In that case, the burden shifts back to the plaintiff to demonstrate that the employer's explanation is a pretext for discrimination. *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[15] that the defendant's reasons were not its true reasons and were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

A plaintiff can show pretext—or, to be more precise, the first of the two components of pretext— "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580

---

[15] The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury *could* make the required finding by a preponderance.

F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired her.'" *Brown v. Kelsey-Hayes Co*., 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.,* that the actual reason was discriminatory. As indicated above, "[t]o demonstrate pretext, a plaintiff must show *both* that the employer's proffered reason was not the real reason for its action, *and* that the employer's real reason was unlawful."[16] *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515 (1993),[17] and *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000)).[18] In

---

[16] The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. *Burdine*, 450 U.S. at 256.

[17] One might reasonably ask whether *St. Mary's Honor Ctr.*, which as noted in *Ford Motor Co.* required the plaintiff to show both things, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine*'s statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's Honor Ctr.*

[18] One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate

18

other words, if the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

### C. *Analysis*

Plaintiff asserts that during the relevant time period, the supervisors and center managers who supervised him at UPS were Jeremy Gossett, Wayne Ramko, Billy Bruce, and Josh Peach. (Doc. No. 49 at ¶ 8). Plaintiff alleges the following actions by his supervisors as direct evidence of national origin discrimination: threatening to deport Plaintiff on numerous occasions in front of Plaintiff's co-workers (Doc. No. 54 at ¶¶ 24-25); asking Plaintiff more than once, in front of co-

---

requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

workers, to produce his "green card" (*Id.* at ¶¶ 26-27); making fun of Plaintiff's accent (*Id.* at ¶ 29); and using his name in a derogatory manner by calling other drivers "Little Ivan" to insult them. (*Id.* at ¶¶ 30-31). Plaintiff also asserts that Union Steward Jeremy Windrow called Plaintiff "scab, Yankee boy, and wetback" and stated to Plaintiff that Plaintiff was "no different than a n****r stealing white American jobs from white Americans." Plaintiff asserts that Bruce, Plaintiff's supervisor, openly approved of Windrow's comments. (Doc. No. 49 at ¶¶ 32-33).

Specifically as to Bruce, Plaintiff asserts the following as direct evidence of national origin discrimination: commenting to another supervisor that Plaintiff had "terrorist blood" in him, that Plaintiff had an "Arabic background," that Plaintiff's mother was from "Arabic or Middle Eastern descent," and that Plaintiff and his family were "on some terrorist watch list" (Doc. No. 54 at ¶¶ 60-62); instructing another employee to "go after" Plaintiff and harass him (*Id.* at ¶ 67); laughing and "chalking it up" when he effectively made Plaintiff mad by issuing discipline to him (*Id.* at ¶ 70); and asking Plaintiff if he had been drinking any "Siberian vodka" (*Id.* at ¶ 29). Plaintiff argues that this evidence shows that Bruce was predisposed to discriminate on the basis of national origin. Plaintiff also argues that Bruce acted on that predisposition in his treatment of Plaintiff. (Doc. No. 50 at 10).

Sparing the reader his personal views about such (alleged) malevolent actions and remarks, the undersigned will stick to the issue at hand. The applicable question is whether such actions and remarks support a claim of discrimination based on Plaintiff's Serbian national origin.

20

Defendant argues that Plaintiff cannot show that making threats to deport him, asking about his "green card," making fun of his accent,[19] calling other drivers "little Ivan," and asking him about Siberian vodka were based on his national origin. "National origin," for purposes of Title VII, includes not just the country where a person was born, but, "more broadly, the country from which his or her ancestors came." *Vega v. Vecellio & Grogan, Inc.*, No. 7:20-cv-00130, 2020 WL 7630709, at *3 (W.D. Va. Dec. 22, 2020) (finding Puerto Rican heritage sufficient for membership in a protected class through the lens of race, national origin, or both) (citing *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973)).[20]

Title VII does not bar discrimination based on citizenship or residency. *Norbuta v. Loctite Corp.*, 1 F. App'x 305, 311 (6th Cir. 2001) (evidence of preference for Canadian citizens not evidence of national origin discrimination), *cited in Igwe v. Salvation Army*, 790 F. App'x 28, 34 (6th Cir. 2019) (remark about green card "does not lead to an unmistakable intent to discriminate

---

[19] The Sixth Circuit recognizes the difference between discriminatory animus motivating accent-based comments directed at an employee and situations when a plaintiff's accent affects his ability to perform the job effectively, when criticism of English skills does not constitute unlawful discrimination. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 487–88 (6th Cir. 2020). The Court notes that Plaintiff testified in his deposition that his supervisors teased him about the way he pronounced certain words because of how he learned English at the age of three, in Canada, not because he has a Serbian accent. (Doc. No. 49 at ¶ 29 and deposition cites therein). To be clear, Plaintiff's point was not that he was teased for having a Canadian accent, but he nevertheless was clear that the teasing was based on his pronunciation of English words (*e.g.*, pronouncing "year" without the "y"), and not on his speaking English with a Serbian accent. Therefore, Plaintiff has admitted that the comments about his English-speaking were not related to his asserted national origin.

[20] "The [Equal Employment Opportunity] Commission defines national origin discrimination broadly as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1, *cited in Vega,* 2020 WL 7630709, at *3.

21

[based] upon national origin"); *John v. Wal-Mart Stores East, Inc.*, No. 3:06-CV-138, 2007 WL 3180099, at *7 (E.D. Tenn. Oct. 26, 2007) (comments made by coworkers related only to plaintiff's status as an immigrant, *an unprotected class,* according to the Supreme Court) (citing *Espinoza*, 414 U.S. 86 at 95); *see also* 42 U.S.C. § 2000e-2(a)(1).

Defendant argues that Bruce used the term "Little Ivan" to compare the performance issues of other drivers to Plaintiff's performance issues, not in regard to Plaintiff's national origin. (Doc. No. 49 at ¶ 30). Plaintiff contends that Bruce used the term "Little Ivan" in a discriminatory manner, but Ivan is Plaintiff's *name*, not his national origin, and Plaintiff has done nothing to establish that Serbs are associated with being "little."[21] Moreover, the comment about "Siberian vodka" has nothing to do with Serbia. Siberia is in northern Asia, not Eastern Europe, and is a long way from Serbia, and Plaintiff does nothing to establish that vodka is associated with Serbia. Despite Plaintiff's colorable belief that Bruce was making a failed attempt to reference Serbia,[22] the reference to Siberian vodka does not address Plaintiff's national origin.[23]

---

[21] To the contrary, the undersigned's distinct impression is that Serbs are associated with being what might be called "strapping." Reported statistics back up this impression. *See https://www.insider.com/tallest-people-world-countries-ranked-2019-6* (reporting Serbia as having the sixth-tallest people in the world, *i.e.*, that only five nations have inhabitants with an average height greater than the average height of Serbs) (last accessed March 30, 2021). The Court would also add—albeit in an observation to which it does not ascribe substantial weight—that, whether Bruce knew it or not, "Ivan" is hardly the classic or stereotypical Serbian first name, even if it is a classic or stereotypical first name for some other nationality.

[22] The undersigned can say from personal experience that American nationals have been known occasionally to confuse Serbia with Siberia (and, for that matter, Syria).

[23] To the contrary, there is no question at all (and a matter as to which this Court believes it could take judicial notice) that although vodka is consumed in Serbia, (1) vodka is not specifically associated with Serbia, and (2) the alcoholic beverage specifically associated with Serbian heritage (and the heritage of certain neighboring countries) is instead a fruit brandy called rakija (of which one well-known variant is slivovitz, a plum brandy).

22

In addition, Bruce's alleged comments to another supervisor that Plaintiff had "terrorist blood" in him, that Plaintiff had an "Arabic background," that Plaintiff's mother was from "Arabic or Middle Eastern descent,"[24] and that Plaintiff and his family were "on some terrorist watch list" (Doc. No. 54 at ¶¶ 60-62) could not reasonably be interpreted as relating to his national origin (Serbia). As alleged slurs against someone of Serbian national origin, these alleged "slurs" are totally misguided.

A reader who is informed about the history of the Serbian people generally may be perplexed by such alleged comments, as they make jabs that simply make no sense—are totally inapplicable—to the Serbian people as a whole. The Court believes that the following facts are undisputable (and would be subject to judicial notice): (1) as with so many peoples around the world, there is diversity within the Serbian people (also known as and referred to herein collectively as "Serbs"), but traditionally and ethnically Serbian people as a group have an identifiable history, geography, and culture; (2) historically, Serbs have had a good deal of contact with persons of Middle Eastern origin, but historically these were primarily Ottoman Turks, who were not "Arabic" people; (3) Serbs as a group are absolutely not considered "Middle Eastern" or "Arabic;" (4) the traditional religion of Serbs is overwhelmingly Orthodox Christian, as practiced by the Serbian Orthodox Church; (5) Serbs are not, and never have been, associated with terrorism,

_____

[24] Notably, Plaintiff's national origin claim is not premised in any way on the allegation that he is perceived as being "Arabic" or "Middle Eastern" and was subject to discrimination based on that perception. Instead, he claims only that he is actually Serbian and was subject to discrimination on that basis.

23

let alone terrorism of Middle Eastern origin;[25] and (6) the Serbian language (with its unique use of two different alternative alphabets, neither of which is remotely similar to the Arabic alphabet) is entirely distinct from the Arabic language. The Court realizes that these observations do not necessarily apply to any particular Serb (including Plaintiff), but they are true of Serbs in general, historically. Given this history, the alleged comments about Arabic or Middle Eastern descent, terrorists, and Siberian vodka simply would not implicate Serbian nationality.[26]

The same is true for Jeremy Windrow's alleged comments, based on what the Court believes to be indisputable connotations of the words allegedly used by Windrow. "Scab" appears to be a clear (albeit, in this context, apparently misplaced) reference to a strikebreaker—a worker who crosses a picket line in the midst of a strike. The term has nothing to do with any particular nationality, let alone Serbian nationality. "Yankee" is a term associated with Americans generally or, alternatively, with Americans from northern states specifically; to say that the term has nothing to do with Serbian nationality would be an understatement. The term "wetback" is a slur referring to persons who illegally enter the United States from Mexico by crossing (swimming across) the Rio Grande River. It is certainly not associated with Serbs generally, nor with the subset (presumably a very tiny one) of Serbs who enter the United States illegally; to the extent that "wetback" tends to refer to immigrants of a particular nationality, it is certainly not Serbian

---

[25] War crimes, which are easily distinguishable from terrorism, is another matter. Based on numerous war crimes convictions of Serbs arising out of the Balkans War of the 1990s, issued by both various national (including Serbian) courts and the International Criminal Tribunal for the former Yugoslavia (based in The Hague, Netherlands), Serbs may be associated (fairly or unfairly) to an extent with war crimes—but not terrorism.

[26] Defendant points out this disconnect to some extent (Doc. No. 53 at 3) but not to the degree that the Court has.

immigrants. Finally, the alleged equation of Plaintiff with the N-word, based on his stealing jobs from white Americans, likewise has nothing to do with Serbian nationality; neither the N-word, nor (as discussed above) being something other than white are associated with Serbian nationality, and relatedly any complaint about persons stealing jobs from "white Americans" is by no means a complaint about Serbs in particular.

From the Court's research, it appears that there is a dearth of authority regarding whether a claim of national origin discrimination can be premised on slurs that are simply misguided.[27]But this need not trouble the Court, because Plaintiff has not even argued that the slurs against him were misguided attempts to refer to Serbs in a negative light. The Court is left with merely a scattered series of insults directed in various directions (including Siberia and the Middle East) but *not once* actually at Serbia (or Serbs).

Moreover, the Court notes that threats to deport Plaintiff or questions about his green card were obviously not actual threats because Plaintiff is and was a United States citizen. Also, encouraging another supervisor to "go after" Plaintiff and harass him is not, in and of itself, a national origin-based comment; neither is "chalking it up" or laughing when Bruce made Plaintiff mad by issuing discipline to him. Finally, the alleged comment by the Union Steward about taking

---

[27] There is authority on the issue of whether a claim of national origin discrimination can be premised on others' misguided belief that the plaintiff belongs to a particular national origin when in fact he or she does not. Some authority suggests that the answer is yes—*i.e.*, that the claim can be premised on the plaintiff being "perceived as" (rather than *actually*) having a particular national origin. But Plaintiff makes no "perceived as" claim; he claims only that he is of Serbian national origin and was (correctly) perceived that way. Any misperceptions implicated in this case are of a different case—*i.e.*, as noted, misperceptions about the nature of Serbs and Serbia.

jobs away from "white Americans" has nothing to do with Plaintiff's national origin of Serbia, since Serbs are also "white."

The Court finds that these alleged comments and threats are not related to Plaintiff's asserted national origin, Serbian. Therefore, they cannot be direct evidence of discrimination for purposes of Plaintiff's Title VII and THRA claims based on national origin.[28]

For purposes of a circumstantial evidence claim, Defendant does not dispute the existence of the first two elements, *i.e.*, that Plaintiff's asserted national origin is a protected class or that Plaintiff was qualified for the position he held with Defendant. Plaintiff asserts that Defendant subjected him to adverse employment actions via over-supervising him, issuing excessive and unwarranted disciplinary actions against him, giving him difficult workloads, and terminating his employment. Defendant argues that unwarranted discipline, over-supervision, and difficult workloads are not adverse employment actions.

Generally speaking, neither increased surveillance nor discipline, whether warranted or not, constitutes a material adverse change in the terms of employment in the discrimination context because those actions do not constitute a significant change in employment status as do things such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Rim v. Lab. Mgmt. Consultants, Inc.*, No. 3:18-cv-00911, 2019 WL 5898633, at *10 (M.D. Tenn. Nov. 12, 2019). The Sixth Circuit has never held that temporarily increasing an employee's workload is a materially adverse employment action. *Courts v. Correct Care Sols., LLC*, No. 3:17-cv-00944, 2019 WL 3425892, at *5 (M.D. Tenn. July 30,

---

[28] The Court also notes that Plaintiff has failed to show that these remarks were made in connection with the alleged adverse employment actions. "The context in which the comments are made is also critical. Discriminatory remarks made while implementing an adverse employment action are likely to reveal animus." *Erwin v. Potter,* 79 F. App'x 893, 898 (6th Cir. 2003).

26

2019). Conduct that does *not* amount to a materially adverse employment action includes close supervision and written warnings. *Andrews v. Lockheed Martin Energy Sys., Inc.*, No. 3:06-CV-42, 2006 WL 2711818, at *11 (E.D. Tenn. Sept. 21, 2006); *Johnson v. United Parcel Serv., Inc.,* 117 F. App'x 444, 451 (6th Cir. 2004*)* (close supervision); *Williams v. AP Parts, Inc.,* 252 F. Supp. 2d 495, 498 (N.D. Ohio 2003) (written warnings).[29]

Discipline can constitute an adverse employment action if it effects a "materially adverse change in the terms and conditions of [plaintiff's] employment." *Williams*, 252 F. Supp. 2d at 497-98. Plaintiff argues that the "warning letters" he received served as a foundation to issue intent-to-discharge letters under the "progressive discipline" provisions of his collective bargaining agreement ("CBA"). (Doc. No. 50 at 17, n.7). Defendant has represented that a May 23, 2017 warning letter issued to Plaintiff for failure to treat a supervisor (Ramko) with dignity and respect "served as the first step in the progressive discipline process under the CBA for the later issuance of an intent-to-discharge letter on July 13, 2017 for refusal to obey a direct instruction."[30] (Doc. No. 49 at ¶ 13). Defendant also contends that the July 13, 2017 intent-to-discharge letter served as the prerequisite for Bruce to serve the July 17, 2017 intent-to-discharge letter that resulted in Plaintiff's termination. (Doc. No. 54 at ¶ 85).

---

[29] The Court notes that the *Williams* court did state that "disciplinary write-ups" can be adverse employment actions when they affect an employee's opportunity for promotion and pay raises or place the employee on probation. *Williams*, 252 F. Supp. 2d at 498.

[30] According to Defendant, the July 13, 2017 intent-to-discharge letter was never acted upon because the July 17, 2017 intent-to-discharge letter resulted in Plaintiff's termination. (Doc. No. 49 at ¶ 13).

27

The Court agrees that the alleged over-supervision and difficult workloads are not adverse employment actions for purposes of Plaintiff's discrimination claims.[31] Plaintiff has demonstrated a genuine issue of material fact, however, as to whether the warning letters and intent-to-discharge letters, as part of Defendant's progressive discipline process, constituted adverse employment actions,[32] and Plaintiff's termination was certainly an adverse employment action.

With regard to his termination, Defendant contends that Plaintiff cannot show that similarly situated, non-Serbian employees were treated differently.[33] Defendant argues that Plaintiff has not shown that any non-Serbian driver failed, in a similar manner, to treat his or her supervisor with dignity and respect and yet was not terminated. Defendant admits, however, that Plaintiff is the only package car driver at UPS's Murfreesboro Center to ever lose his job for "failure to treat a

---

[31] In its Reply, Defendant argues that Plaintiff waived his excessive workload and over-supervision claims by not raising them or sufficiently arguing them in his response to the Motion. (Doc. No. 53 at n. 11). The Court need not address this argument, because it does not view these alleged actions as representing adverse employment actions. As for excessive discipline, Plaintiff did address that claim in his response. (Doc. No. 50 at 17, n.7).

[32] Supervisor Ramko explained in his deposition that the May 23, 2017 warning letter was used in Defendant's "line of progressive discipline" as a foundation for the termination of Plaintiff's employment. (Doc. No. 48-6 at 40 [Dep. at 160]). The May 23rd warning letter states that it is "official notice that further instances of your failure to treat your supervisor with dignity and respect will result in further disciplinary action up to or including discharge." (Doc. No. 43-5; Doc. No. 48-5 at 44 [Dep. at 174]). As noted above, Defendant has stated that the July 13, 2017 intent-to-discharge letter served as the prerequisite for Bruce to serve the July 17, 2017 intent-to-discharge letter, which was the letter that resulted in Plaintiff's termination. (Doc. No. 54 at ¶ 85). There is at least a genuine question of fact as to whether these warning letters and intent-to-discharge notices essentially "built upon" each other and led to Plaintiff's firing.

[33] Plaintiff does not argue that he was replaced by someone outside the protected class. (Doc. No. 49 at ¶ 57).

28

supervisor with dignity and respect."[34] Plaintiff points to the case of Josh Johnson, a non-Serbian package car driver; according to Plaintiff, Johnson "cussed, yelled at, and verbally and physically threatened Ramko (a supervisor) on one particular occasion, such that the two men had to be "broken up" before they got into a fight, and yet never received any type of discipline, let alone termination. (Doc. No. 54 at ¶ 86).[35] Plaintiff has carried his burden to show that there are genuine issues of material fact as to whether similarly situated employees outside the protected national origin class were treated differently in terms of discipline and termination, and thus for summary judgment purposes, he has successfully established his *prima facie* case as to the alleged discriminatory acts of unwarranted and excessive discipline and termination.[36]

Defendant also asserts that even if (as the Court has found) Plaintiff could establish a *prima facie* case of discrimination, he has not provided any evidence of pretext. As noted, Plaintiff has no obligation to show pretext unless Defendant first shows a legitimate, non-discriminatory reason

---

[34] Although Defendant asserts that non-protected employees were *disciplined* for failure to treat supervisors with respect, it admits that Plaintiff is the only employee who was *terminated* for that behavior. (Doc. No. 54 at ¶¶ 52-53).

[35] Defendant reserved the right to challenge these facts at trial but did not dispute them for purposes of summary judgment. (Doc. No. 54 at ¶ 86).

[36] Defendant claims that Plaintiff failed to file a grievance disputing his termination within the ten-day period allowed by his applicable collective bargaining agreement and that was the reason his termination became permanent. There are multiple issues of fact with regard to the final intent-to-discharge letter issued to Plaintiff, including whether Plaintiff was ever served with the corrected copy (the parties do not dispute that the initial letter was issued on July 17, 2017, but it was dated July 13, 2017) and whether Plaintiff appropriately grieved the intent-to-discharge letter that resulted in his termination. (Doc. No. 49 at ¶¶ 41-45, 48; Doc. No. 48-1 at 40-41, 65 [Dep. at 150-155 and 251-252]; Doc. No. 49-1 at 7 ("The notice was never protested by the grievant because he, nor the steward received a copy from the Company.")). The factfinder here will have to determine any relevant facts surrounding this issue.

for its actions. Defendant's articulated reason for terminating Plaintiff's employment was that he failed to treat his supervisors with dignity and respect by sending Supervisors Woodruff and Peach an offensive text message on July 14, 2017.[37] That text specifically stated:

> Hey, man, when you go to church Sunday please stand in front of your congregation and tell them how you robbed a man of his family time today & tell them that 2 drivers had heat stroke but the next day you put 215 stops on a driver & made him go back out to do more work! Please do that for me Sunday & tell me what they say. One day we will all stand in front of God & his holy son & have to answer for everything, big & small. Please let me know what your church tells you! God bless.

(Doc. No. 49 at ¶ 38). It is no exaggeration to say that a reasonable employer could take this text as conveying an accusation that its supervisors had committed an egregious and mortal sin. A reasonable employer could determine, entirely irrespective of the employee's membership in a protected class, that the employee's sending of such a text was intolerable and grounds for termination. The Court finds without difficulty that (i) the proffered reason is legitimate and not discriminatory; and (ii) Defendant has presented evidence sufficient to support a finding that this proffered legitimate reason was the actual reason. Thus, burden shifts to Plaintiff to show that the proffered reason actually was a pretext.

In summary, as the Court has indicated above, the alleged discriminatory comments by Plaintiff's supervisors here were not based upon Plaintiff's national origin, and Plaintiff has not come forward with any additional evidence of discriminatory motive based upon national origin. Therefore, the Court finds that Plaintiff has not demonstrated a genuine issue of material fact as to whether Defendant's legitimate, non-discriminatory reason was pretext for national origin

---

[37] The text was sent after Plaintiff allegedly had an excessive workload and requested help from both Woodruff and Peach, who did not provide that help, and Plaintiff completed his delivery route late. (Doc. No. 49 at ¶ 37).

discrimination, neither has he shown that the *real* reason for Defendant's actions was his national origin. Therefore, Defendant is entitled to summary judgment on Plaintiff's Title VII and THRA national origin discrimination claims, and those claims will be dismissed.[38]

## HOSTILE WORK ENVIRONMENT

Plaintiff's hostile work environment claim is based upon Title VII race and national origin. *See* Complaint (Doc. No. 1) at Count II. Because the Court has found no valid Title VII claim based upon race and no discriminatory comments based upon national origin, Plaintiff's hostile work environment claim based upon these two protected classifications also fails.

Therefore, Defendant's Motion will be granted as to Plaintiff's hostile work environment claim, and that claim will be dismissed.

## RETALIATION

1. Direct Evidence

For a plaintiff to prevail under a theory of direct evidence of retaliation, he would have to show both "blatant remarks" revealing the defendant's retaliatory intent and that the retaliatory intent was a motivating factor in the defendant's adverse employment action toward him. *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 235–36 (6th Cir. 2017). As indicated above, direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination (or, here, retaliation) was at least a motivating factor in the employer's actions. *McGee*, 2017 WL 587856, at *2. Direct evidence is composed of only the most blatant remarks, whose intent could mean nothing other than to discriminate (or retaliate) on the basis of some impermissible factor.

---

[38] Ultimately, then, what doomed Plaintiff's prospects on his direct-evidence case (the fact that Plaintiff did not demonstrate animus based on his national origin) is what doomed his indirect-evidence case, albeit only at the last stage of the analysis of his indirect-evidence case.

31

*Publix,* 481 F. Supp. 3d at 697. Direct evidence does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by discrimination or retaliation. *Id.*at 697-98. Importantly, the evidence must establish not only that the plaintiff's employer was predisposed to discriminate (retaliate), but also that the employer acted on that predisposition. *Id.* at 698.

Plaintiff asserts that the following alleged remarks of Bruce are direct evidence of Bruce's retaliatory animus[39] towards him: stating to other managers that he was "going to figure out a way to get Ivan Kostic fired" and "we have to find a way to get [Ivan Kostic] gone" (Doc. No. 54 at ¶¶ 65-66); stating that he was "going to get Ivan back for filing grievances and calling the 800 line on [Bruce]" (*Id.* at 64); and calling Gossett using the speaker phone after he fired Plaintiff and saying "We got him!" (*Id.* at ¶ 132).[40] Defendant has agreed to treat as undisputed, for purposes of summary judgment, Plaintiff's claim that Bruce in fact made these remarks. Bruce was the supervisor who issued the intent-to-discharge letter that led to Plaintiff's termination. (Doc. No. 54 at ¶ 110).

The Court finds that these remarks constitute direct evidence of retaliation by Bruce because they require the drawing of no inferences to reach the conclusion that Bruce wished to

---

[39] Courts use the word "retaliation" interchangeably with "discrimination" with respect to direct evidence standards. In other words, in the context of a claim of retaliation, retaliation is covered by the broader term, "discrimination." For example, in *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 383 (6th Cir. 2002), the court stated: "We conclude that Ensworth's deposition comments do not constitute direct evidence of retaliation. When determining whether proffered evidence constitutes direct evidence of discrimination, we consider whether the evidence, if believed, compels the conclusion that retaliatory animus played a part in the challenged decision."

[40] Defendant did not dispute these facts for purposes of summary judgment but reserved the right to challenge them if the case proceeds to trial. (Doc. No. 54 at ¶¶ 64-66 and 132).

retaliate against Plaintiff for complaining about alleged violations of Title VII. In particular, Bruce's statement that he was going to find a way to get Plaintiff back for filing grievances and calling the 800 line (hereinafter, "primary statement") directly reflects an intent to retaliate. If the factfinder were to find that Bruce actually made the primary statement (and meant what he said), the primary statement requires a conclusion by the factfinder that retaliation was at least a "motivating factor" for Bruce's actions. So the primary statement constitutes direct evidence, and the other statements referenced above are also direct evidence insofar as they tend to show that, as indicated by the primary statement, Bruce indeed desired to terminate Plaintiff (based on what that primary statement suggests was retaliatory animus). At a minimum, these statements successfully demonstrate a genuine issue of material fact as to whether Bruce's decision to fire Plaintiff was based on a desire to retaliate against Plaintiff for his many grievances.[41] The Court finds that the alleged statements by Bruce qualify as "direct evidence" of retaliation.

Defendant argues that these statements cannot serve as direct evidence of discrimination because they were not made in connection with Plaintiff's termination or any disciplinary action. In other words, though all of these statements plainly refer to *desired or potential* termination of Plaintiff at some point, Defendant claims they were not connected with the *actual* termination or discipline of Plaintiff that eventually occurred at particular junctures. Defendant relies on the accepted principle that statements and facts unrelated to the decisional process itself are generally not probative of discrimination. *Allen v. Braithwaite*, No. 2:18-cv-02778, 2020 WL 3977671, at

---

[41] Defendant does not dispute, for purposes of summary judgment, that it was aware that Plaintiff filed at least 40 grievances from 2014 through 2017 claiming harassment and discrimination in the workplace. Defendant also does not dispute that Plaintiff made six phone calls to Defendant's Human Resources 800 line claiming harassment and discrimination directed at him by Bruce plus three such phone calls claiming retaliation by Bruce. (Doc. No. 54 at ¶¶ 165, 168-69).

33

*8 (W.D. Tenn. July 14, 2020). The person (other than Plaintiff) who testified about Bruce making these allegedly retaliatory statements is Joshua James, a package center supervisor for Defendant. As reflected by his deposition transcript (Doc. No. 48-3), James testified about many derogatory things he heard Bruce say about Plaintiff, including the above-referenced statements that Plaintiff asserts are direct evidence of retaliation. James agreed that Bruce made these statements in the weeks and days leading up to August 2017 (the month Plaintiff was fired). (Dep. at 38). Although there may be questions of fact as to exactly *how* closely related (in time or otherwise) the alleged retaliatory comments were to the relevant intent-to-discharge letters and Plaintiff's termination, the Court finds that they were sufficiently close for purposes of being direct evidence of Bruce's retaliatory motive.

Here, the Court finds that a jury reasonably could believe this direct evidence of Bruce's retaliatory animus. As Plaintiff's supervisor, Bruce was the decision-maker who terminated his employment with Defendant. Plaintiff has presented direct evidence of retaliation, and the burden shifts to Defendant to prove that it would have terminated Plaintiff even if it had not been motivated by retaliation.[42] As the summary judgment movant, Defendant could not obtain summary judgment unless its proof was so strong that a jury would *have* to accept that the termination in fact was for some other reason. Defendant does not even try to meet that very heavy burden with regard to Plaintiff's direct-evidence retaliation theory; Defendant argues simply that Plaintiff has no direct evidence of retaliation, without alternatively addressing whether Defendant would have terminated Plaintiff anyway—a question that will fall to the jury to answer (if the jury

---

[42] If a plaintiff produces direct evidence of discrimination, the burden shifts to the defendant to prove that it would have taken the same adverse action against the employee, "even if it had not been motivated by impermissible discrimination." *Pendleton*, 2016 WL 2927983, at *5.

34

gets that far, by crediting Plaintiff's direct evidence). Where a plaintiff produces credible direct evidence of retaliation, "in the absence of an alternative, non-discriminatory explanation for that evidence, there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court." *Norbuta*, 1 F. App'x at 311–12.

### 3. Circumstantial Evidence

Alternatively, even if not direct evidence of retaliation, the above-described retaliatory comments are sufficient circumstantial evidence of retaliation to raise genuine issues of material fact. To state a retaliation claim based on circumstantial evidence, a plaintiff must allege plausible facts that: (1) he engaged in protected conduct;[43] (2) the defendant had knowledge of this protected activity; (3) the defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Shallenberger v. CoreCivic-Trousdale Turner Corr. Ctr.*, No. 3:19-cv-00900, 2020 WL 869984, at *4 (M.D. Tenn. Feb. 21, 2020).

To demonstrate the third requirement, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in the Title VII *retaliation* context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Jones v. Vilsack*, No. 3:15-cv-01006, 2020 WL 3264085, at *6 (M.D. Tenn. June 17, 2020). This requirement is different from, and less onerous than, the requirement for showing a materially adverse action in the Title VII *discrimination* context. *Id.* In particular, unlike Title VII's anti-discrimination provision, the anti-retaliation provision of Title VII is not

---

[43] Protected conduct includes "oppos[ing] any practice made an unlawful employment practice by [Title VII]," or "ma[king] a charge, testif[ying], assist[ing] or participat[ing] in any manner in an investigation, proceeding, or hearing under [Title VII]." 28 U.S.C. § 2000e–3(a).

limited to discriminatory actions that affect the terms and conditions of employment. *Id.* (citing *Rogers v. Henry Ford Health Syst.*, 897 F.3d 763, 775-76 (6th Cir. 2018)).

It is undisputed that Plaintiff engaged in at least some protected activity and that Defendant knew about such protected activity (although Defendant minimizes the amount of protected activity, as discussed below).[44] It is also undisputed that Defendant issued intent-to-discharge letters and ultimately fired Plaintiff, which are materially adverse employment actions in the anti-retaliation context, inasmuch as a reasonable employee might forego making a charge of discrimination in order to avoid them. In addition, as discussed below, Plaintiff asserts materially adverse, post-employment, retaliatory actions taken by Defendant against him. For purposes of the Motion, the only element actually in dispute is the fourth, whether there was a causal connection between Plaintiff's protected activity and his termination.

A plaintiff making a retaliation claim under Title VII must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer. *Robinson v. MGM Grand Detroit, LLC*, 821 F. App'x 522, 528 (6th Cir. 2020). Plaintiff may show a "but for" cause sufficient for opposing a motion for summary judgment by producing "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had plaintiff not [engaged in protected activity]." *Rizzo v. Wilkie*, Civ. No. 17-95-DLB-CJS, 2020 WL 6947480, at *7 (E.D. Ky. Nov. 25, 2020) (quoting *Nguyen*, 229 F.3d at 563). At the *prima facie* stage, this burden "is not onerous," and can be met through evidence that the defendant treated the plaintiff

---

[44] As noted above, Defendant does not dispute that from 2014 through Plaintiff's termination, Plaintiff filed 40 grievances and called the HR 800 line to voice harassment and discrimination directed to him by Billy Bruce specifically in the workplace on at least six separate occasions. (Doc. No. 48-11 at 14).

differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights. *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020).

Seeking to limit Plaintiff's option for drawing a connection between protected activity and adverse action, Defendant argues that the only grievance that qualified as protected activity in this case is the May 3, 2017 grievance, which alleged that Plaintiff was made fun of, bothered, harassed and discriminated against by Billy Bruce "for the way I talk & because of the country I come from." (Doc. No. 49-9).[45] That grievance also included the statement "it sucks to be an immigrant at UPS!" (*Id.*) Plaintiff has also provided evidence, however, that he filed a grievance on July 6, 2017 (11 days before his termination) that stated: "Bill Bruce continues to harass & humiliate me in front of hourly's because of a skin condition I have & because I'm an immigrant. I want Bill Bruce to be terminated for racism & discrimination before I go to channel 4 news to let people know what immigrants go through at UPS!" (Doc. No. 49-13).[46]

Plaintiff also filed a grievance on June 2, 2016 (Doc. No. 49-21) that stated "I am continuously being harassed by Billy Bruce because of my workers comp injury & because of my

---

[45] Two weeks later, Bruce sent a letter to his supervisors (including the Division Manager) complaining that Plaintiff was "erratic and unstable" and "continuously causes problems at work and acts in a paranoid manner." Bruce stated: "It is my genuine belief that he could be a danger to himself and others. What can we do?" (Doc. No. 54 at ¶ 75).

[46] On July 13, 2017, Bruce sent an email to Defendant's Human Resources Operations Manager, Division Manager, and Communications Supervisor about Plaintiff's July 6th grievance, leaving out the part about Bruce's harassment and humiliation of Plaintiff and Plaintiff wanting Bruce fired and, instead, focusing on the part about Plaintiff contacting Channel 4 news. (Doc. No. 54 at ¶ 88). Also on July 13, 2017, Bruce issued an intent-to-discharge letter to Plaintiff, based upon Plaintiff's alleged failure to obey an instruction from a supervisor (Woodruff) and for allegedly calling Woodruff "stupid." (Doc. No. 49 at ¶ 13; Doc. No. 43-11).

37

nationality & because I'm on the 9.5 list. I want UPS, HR & Labor management to take all this harassment by Billy very serious & move Billy out of M'boro!" (*Id.*).

In addition, Plaintiff asserts that Defendant continued to take retaliatory actions against him, even after he was fired (on August 25, 2017), when Defendant's security supervisor called 911 emergency dispatch and reported that Plaintiff had made threats and "had weapons on him."[47] This call resulted in two officers being dispatched to Plaintiff's home. (Doc. No. 54 at ¶¶ 134, 138). The officers found nothing—including weapons—to support the allegations made in the 911 emergency call. (*Id.* at ¶¶ 143-44). Defendant admits these facts, for purposes of summary judgment, as well as admitting that the dispatched officer stated, "These were serious accusations" made against Plaintiff and the investigation revealed "nothing that showed any kind of harm or hurt to himself or anybody else." (*Id.* at ¶ 147). [48]

Both the Supreme Court and the Sixth Circuit have recognized that former employees are protected against retaliation under Title VII. *See Downs v. United States Postal Serv.*, No. 3:19-cv-00057-RGJ, 2019 WL 3947921, at *4 (W.D. Ky. Aug. 21, 2019) (citing *Robinson v. Shell Oil Co.,* 519 U.S. 337, 339 (1997) and *EEOC v. Ohio Edison Co.*, 7 F.3d 541, 544 (6th Cir. 1992)). In *EEOC v. Outback Steakhouse of Florida, Inc.*, 75 F. Supp. 2d 756 (N.D. Ohio 1999), the court held that the anti-retaliation provision of Title VII is not limited to retaliation affecting

---

[47] Plaintiff asserts, and Defendant does not dispute for purposes of this Motion, that someone (whose name escaped Davis) was standing next to Davis and feeding him information about Plaintiff while Davis was speaking with 911 dispatch on that day. (Doc. No. 54 at ¶ 136).

[48] Defendant argues that Plaintiff has waived any claim based on post-employment actions by failing to cite them in his response. Plaintiff cited these allegations in his Statement of Undisputed Facts, however, and they are further alleged evidence of retaliation, and the Court will consider this evidence for purposes of summary judgment.

38

employment terms but may include other forms of retaliation that are allegedly adverse to the employee or former employee. *Id.* at 758. The court concluded that the kind of discrimination prohibited by the anti-retaliation statute cannot be limited simply to a change in employment status. *Id.*[49] While the Sixth Circuit has not addressed this precise issue, the majority of courts, including the Supreme Court, have been willing to construe Title VII (and companion provisions under the Fair Labor Standards Act and the ADEA) broadly in order not to frustrate the purpose of these Acts, which is to prevent employers from inducing aggrieved employees "quietly to accept [unlawful] conditions" due to "fear of economic retaliation." *See Mitchell v. Robert DeMarco Jewelry, Inc.*, 361 U.S. 288, 292 (1960); *Ohio Edison*, 7 F.3d at 544-45.[50] This Court is persuaded by the foregoing analysis and, like the court in *Outback Steakhouse*, concludes that the anti-retaliation provisions of Title VII and the THRA cannot be exclusively limited to adverse actions that effect changes in the employment relationship.

---

[49] "The reasoning for this is simple: nothing in the plain language of the statute admits of such a qualification, and there is nothing in the statute which the court finds ambiguous. Title VII states that employers cannot discriminate against employees in retaliation for employees' participation in claims brought under the statute." *Outback*, 75 F. Supp. 2d at 758. Furthermore, the court reasoned that, although the substantive provisions of Title VII clearly limited actionable discrimination to claims that are related to employment, the anti-retaliation provision "contains no such qualifiers, prohibiting only discrimination that takes place because an employee has 'made a charge, testified, assisted, or participated' in actions under Title VII. The inclusion of qualifying language in Title VII's substantive provision, and its exclusion in the anti-retaliation provision, implies that a retaliatory act need not be employment-related in order to be actionable under Title VII." *Id.*

[50] The Court notes that very recently, the Sixth Circuit reiterated the principle that excluding former employees from the protections of Title VII would "effectively vitiate much of the protection afforded by [the statute]" because it would deter reporting to the government and "provide a perverse incentive for employers to fire employees who might bring Title VII claims." *United States ex rel. Felten v. William Beaumont Hosp.,* No. 20-1002, slip. op. at 9 (6th Cir. Mar.31, 2021).

Moreover, Title VII's anti-retaliation provision, unlike its anti-discrimination provision, is not limited to discriminatory actions that affect the terms and conditions of employment. *Jones,* 2020 WL 3264085, at \*6. Again, to demonstrate a materially adverse employment action for purposes of a retaliation claim, a plaintiff must show that the challenged action well might have dissuaded a reasonable worker from making or supporting a charge of discrimination or retaliation; obviously, this persuasive effect can be imparted by actions unrelated to the terms and conditions of employment as such. *Id.* In short, in the retaliation context, an employer's materially adverse action need not be an employment action (as opposed to an action post-dating employment or otherwise unrelated to employment).

Therefore, the evidence of Defendant's post-employment activity, calling the 911 Emergency Dispatch to send officers to Plaintiff's home, can be considered as part of the alleged retaliation by Defendant. The Court finds that, taken together, the above-cited evidence creates genuine issues of material fact as to the connection between Plaintiff's grievances and the adverse employment actions against him.

Consequently, the burden of proof shifts to Defendant to articulate a legitimate, nondiscriminatory reason for its decisions and, if it does so, the burden shifts back to Plaintiff to show pretext. As set forth earlier, Defendant has articulated a legitimate, non-discriminatory reason for firing Plaintiff: his (alleged) failure to treat his supervisors with dignity and respect. The burden thus shifts to Plaintiff to show pretext.

The Court will not restate the legal framework for pretext, as it is carefully delineated above (with regard to discrimination), other than to note that case law reflects the applicability of the same principles in the context of a retaliation claim. *E.g., Kirilenko-Ison*, 974 F.3d at 661. Thus, at the summary judgment stage, a plaintiff must show sufficient evidence from which a reasonable

jury could conclude that the stated reason was the not true reason, and that instead unlawful retaliation actually was.[51]

Given the totality of all this evidence, including the alleged remarks showing retaliatory animus and the intent-to-discharge letters[52] issued in close temporal connection with Plaintiff's grievances, Plaintiff has sufficiently demonstrated a genuine issue of material fact as to whether Defendant's reason for firing him was pretext for retaliation *i.e.,* a false reason stated in lieu of an actual retaliatory reason. The Court has found that Plaintiff submitted direct evidence of retaliation sufficient to take this claim to a jury; but alternatively, he has carried his burden as to circumstantial evidence on his retaliation claim, for purposes of summary judgment, and Defendant's motion related to Plaintiff's retaliation claim will be denied.

## CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment (Doc. No. 43) will be granted in part and denied in part. Summary judgment is granted to Defendant as to Plaintiff's claims under Section 1981, Plaintiff's claims under Title VII and the THRA for racial and national origin discrimination, and Plaintiff's Title VII hostile work environment claim based upon race and national origin. Summary judgment is denied as to Plaintiff's claim for retaliation, and that claim remains for trial.

---

[51] In a Family and Medical Leave Act retaliation case, the Sixth Circuit has stated: "The central issue raised by the retaliation theory . . . is 'whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012).

[52] Bruce issued another intent-to-discharge letter, *after* the one upon which Plaintiff's termination was based, on August 1, 2017, for "repeated failure to follow instructions on the proper appearance guidelines." (Doc. No. 54 at ¶ 43).

41

An appropriate Order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE